WILLIAM D. LARIMORE AND FLORENCE LARIMORE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ADMIRAL MOVING & STORAGE, INC. (Formerly Beaverton Transfer Co., Inc.), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Larimore v. Commissioner
Docket Nos. 29329-82, 29330-82.
United States Tax Court
T.C. Memo 1986-326; 1986 Tax Ct. Memo LEXIS 285; 51 T.C.M. (CCH) 1619; T.C.M. (RIA) 86326; July 29, 1986. Neil J. Driscoll, for the petitioners. Christine V. Olsen, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket No.
Petitioner
Year
Deficiency
29329-82
William D. Larimore &
1978
$1,473.00
Florence Larimore
1979
2,361.00
29330-82
Admiral Moving & Storage,
1975
312.00
Inc. (Formerly Beaverton
1978
1,808.50
Transfer Co., Inc.)
1979
997.00
*288 The issues for decision are as follows: (1) The extent to which the corporate petitioner is entitled to business expense deductions under section 162, [1] depreciation deductions under section 167, and investment credit under section 38, for the costs and expenses it incurred during 1978 and 1979 in the acquisition, operation, and maintenance of two Mercedes Benz automobiles; [2] and (2) Whether the individual petitioners received compensation [3] and/or constructive dividend income relating to the automobiles. *289 FINDINGS OF FACT [4]
Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. William *290 D. Larimore (Mr. Larimore) and Florence Larimore (Mrs. Larimore) (collectively, the Larimores or the individual petitioners), husband and wife, resided in West Linn, Oregon, at the time they filed their petition in this case. Admiral Moving & Storage, Inc. (formerly Beaverton Transfer Co., Inc.) (the corporation) had its principal place of business or principal office or agency in West Linn, Oregon, at the time it filed its petition in this case. The individual petitioners filed their 1978 and 1979 joint U.S. income tax returns (Forms 1040) with the Internal Revenue Service Center in Ogden, Utah. The corporation filed its 1978 and 1979 U.S. corporation income tax returns (Forms 1120) with the Internal Revenue Service Center in Ogden, Utah. During 1978 and 1979, the corporation was engaged in the moving and storage business. During such years, Mr. Larimore was the corporation's president and sole stockholder. Mr. Larimore has been in the moving business since 1960. As president, Mr. Larimore oversaw the corporation's entire business. In particular, Mr. Larimore was heavily involved in the sales end of the business, especially large corporate accounts. The corporation paid *291 Mr. Larimore wages totaling $28,600 during 1978, and $37,400 during 1979. During 1978 and 1979, Mrs. Larimore was the corporate secretary. Before those years, Mrs. Larimore had suffered a brain aneurysm, but she had fully recovered and was back at work by January 1, 1978. She worked full-time for the corporation during the years in issue. She worked the same hours that Mr. Larimore did; they considered themselves partners in the business. The Larimores worked an average of 10 hours each day, usually 6 days a week. As the corporation's secretary, Mrs. Larimore performed the duties of an office manager and a corporate comptroller. She did general bookkeeping, made up the payroll, did the corporation's banking, consulted with the corporation's certified public accountant, William F. Holdner, (the CPA), purchased office supplies, handled the corporation's mail, and generally did anything else in the office that needed to be done. During the years in issue, the corporation did not pay Mrs. Larimore any salary or wages. [5]
*292 During the years in issue, the corporation never declared or paid any dividends. During such years, the corporation employed between 22 and 40 people, depending on its workload. Four of those employees, in addition to Mr. Larimore, were on the sales staff. At the beginning of 1978, the corporation owned a number of passenger automobiles, including a 1973 Mercedes Benz, a 1975 Datsun 280Z, a Volkswagen, a Volkswagen Dasher, two Chevrolet Vegas (one a 1971, and the other a 1972 or 1973 model), and a Buick Riviera. The corporation sold that 1973 Mercedes Benz in April of 1978 and sold the Datsun 280Z in May of 1978. Of the remaining automobiles, only three, the two Volkswagens an the later model Vega, were reasonably reliable. However, all of the automobiles were covered under the corporation's insurance policy.The earlier model Vega had some engine problems, and also needed new brakes and tires. The Buick was expensive to operate, and therefore Mr. Larimore was reluctant to use it. He quit driving the Buick, and the longer it sat without being used, the more difficult it became to start and the more problems it developed. The corporation's business required that it have some *293 reliable automobiles. The three automobiles that were in reasonably good operating condition were used by the sales staff and were "marked," that is, they had billboards on each side with the corporation's name on them. The record does not establish that there were any operating problems with either the 1973 Mercedes or the Datsun 280Z that were sold in 1978. [6]
On January 10, 1978, the corporation purchased a new 1978 Mercedes Benz 240-D diesel engine automobile (the 240-D) for $14,364. The title to the 240-D was registered in the corporation's name upon its purchase.The minutes of the annual stockholders meeting held on January 2, 1978, stated that "[a]s a bonus for her [Mrs. Larimore's] efforts thru the years Mr. Larimore said he would look for a new auto *294 for her." On April 24, 1978, the corporation purchased a used 1975 Mercedes Benz 450-SL gasoline engine automobile (the 450-SL) for $17,004. The 240-D and the 450-SL are sometimes collectively referred to herein as the Mercedes automobiles. Although the 450-SL was purchased with the corporation's funds, the title to the automobile was registered in the names of Mr. and Mrs. Larimore. [7] Mr. Larimore selected the 450-SL without Mrs. Larimore's help. During the years in issue, the individual petitioners had no other automobile registered in their names except the 450-SL. *295 Mr. Larimore put most of the miles on the 240-D. He used it for a variety of business purposes, including calling on corporate accounts, that is, large corporations that contracted to move the belongings of their personnel. He also used the 240-D for other business purposes, including surveying households so that he could estimate the cost of moving them, collecting accounts receivable, performing post-move surveys of customers to evaluate the corporation's performance (these were required by the corporation's major van lines affiliate at the time, Global Van Lines), attending sales and other seminars given by Global Van Lines that Mr. Larimore was required to attend, and running general business errands. Other employees of the corporation also used the 240-D on occasion for various business purposes. Petitioners considered the 450-SL to be "Flo's [Mrs. Larimore's] car." She used the 450-SL for a variety of business and personal purposes. She drove it to the bank to make daily deposits, to the CPA's office roughly twice a week, to buy office supplies about twice a week, and to make a daily trip to the post office. She also ran personal errands while on business errands. *296 Other employees of the corporation also used the 450-SL for various business purposes. Members of the sales staff drove it when they wanted an "unmarked car." Other office employees used it to pick up office supplies. The corporation's mechanic used it to get parts. Other employees drove the 450-SL to job sites to take extra packing material or to supervise the job. They also used it when making claim estimates, that is, to go to a customer's house or office to check any claimed damage incurred during a move. However, none of the corporation's employees other than the Larimores ever drove the 240-D or the 450-SL to their homes at night. In addition to the business uses of the Mercedes automobiles described above, the Larimores also used both automobiles for personal purposes. They used at least one of the Mercedes automobiles to commute between their home in West Linn, a suburb of Portland, Oregon, to the corporation's office in Tigard, Oregon, another Portland suburb, about a 20-mile roundtrip. This amounted to about 6,000 miles per year for commuting. The Larimores frequently drove to and from work together in the 240-D, and left the 450-SL at the corporation's office at *297 night. Sometimes both cars were driven home and used for commuting. The Larimores always drove separately when Mr. Larimore had a business appointment after hours or when he went out of town for a seminar. If the corporation had a move in the general vicinity on his way home, Mr. Larimore sometimes stopped by to see how things were going, or to say hello to the customer. Mr. Larimore also sometimes conducted the post-move surveys on his way home in the evening. During the years in issue, the Larimores spent their recreational time on a power boat they kept moored on the Columbia River, about 14 miles from the corporation's office. They spent many weekends on the boat, usually driving there in the 240-D straight from the corporation's office. Occasionally, the Larimores would make a business stop on the way to or from the boat. Mr. Larimore also needed an automobile when he was at home or at the boat so that he could take care of any business problems that might arise during nonbusiness hours. The Larimores' other personal uses of the Mercedes automobiles frequently took place on the way to work in the morning, during the middle of the day, or on the way home from work in *298 the evening. Despite the mixed business and personal uses of both Mercedes automobiles, the corporation paid all operating and maintenance expenses for them. The corporation paid insurance premiums during 1978 and 1979 in the amounts of $350 for the 240-D, and $400 for the 450-SL each year. The corporation also paid for all fuel used to operate both Mercedes automobiles during the years in issue. During those years, the retail price of diesel fuel for the 240-D was about $ .75 per gallon, and the retail price of gasoline for the 450-SL was about $ .95 per gallon. However, the corporation never bought fuel for the automobiles at retail. The corporation purchased both diesel fuel and gasoline at wholesale and stored it in big storage tanks it owned, one for diesel fuel and one for gasoline. The corporation used such fuel to operate its moving vans, sales automobiles, and the two Mercedes automobiles. The wholesale price the corporation paid for diesel fuel was about $ .40 per gallon during 1978, and about $ .55 per gallon during 1979. The wholesale price the corporation paid for gasoline was about $ .60 per gallon during 1978, and about $ .75 per gallon during 1979. The 240-D *299 averaged 30 miles per gallon and the 450-SL averaged 14 miles per gallon. The corporation also paid all maintenance expenses for both Mercedes automobiles. However, during the years in issue, both automobiles were under warranty and both ran basically troublefree, so the corporation's out-of-pocket expenses were minimal. The 240-D was under warranty from the time of purchase until the longer of two years or 50,000 miles. The warranty covered almost everything except tires. The corporation's primary maintenance expenses were for oil and oil filter changes. Mr. Larimore or the corporation's mechanic did the work. [8] During 1978 and 1979, the corporation incurred expenses for oil and oil filters for the 240-D in the amounts of $31.95 and $33.50, respectively. During those years, the average routine maintenance expenses for a 1978 240-D through the first 19,000 miles were between $300 and $350. For the next 17,000 miles, average routine maintenance expenses were a little higher. *300 The 450-SL was also under warranty up to 50,000 miles. However, the 450-SL had 15,000 miles on it when the corporation bought it so that only 35,000 miles of warranty coverage remained. The warranty was not complete, but covered most items. The only maintenance expenses that the corporation incurred for the 450-SL during 1978 and 1979 were for oil and oil filter changes, valve adjustments, and tune-ups. Again, Mr. Larimore or the corporation's mechanic performed the maintenance work. See n.8, supra. The corporation incurred out-of-pocket maintenance expenses for the 450-SL in the amounts of $88.54 during 1978, and $33.72 during 1979. During those years, average routine maintenance expenses for a 1975 Mercedes Benz 450-SL for mileage between 15,000 miles and 25,000 miles were between $400 and $600. Neither the corporation nor the individual petitioners kept any records of business or personal use of either Mercedes automobile. The individual petitioners reimbursed the corporation a total of $600 ($25 per month per automobile) each year for their personal use of the Mercedes automobiles. During 1978 and 1979, the fair rental value of a new 1978 240-D was between $280 and *301 $290 per month. During those years, the monthly lease charge for a used 1975 450-SL was about $350. These monthly lease figures did not include operating and maintenance expense; i.e., the lessee was responsible for operating and maintenance expenses. However, those fair rental figures would include some profit for the lessor. On its 1978 return, the corporation claimed investment credits for the Mercedes automobiles in the amount of $2,089, computed as follows: [9]
Useful
Applicable
Qualified
Automobile
Cost
Life
Percentage
Investment
240-D
$14,364
5-6 yrs.
66.67%
$ 9,566
450-SL
17,004
5-6 yrs.
66.67%
11,325
Total qualified
investment:
$20,891
Regular percentage
10% Investment credit
$ 2,089
The investment credits claimed by the corporation were based on 100-percent business use of the two automobiles. On its 1978 and 1979 returns, the corporation claimed depreciation deductions for *302 the Mercedes automobiles as follows: [10]
Claimed Deduction
1978
1979
240-D depreciation
$2,000
$2,000
450-SL depreciation
2,000
3,000
The depreciation deductions claimed by the corporation for the Mercedes automobiles were based on 100-percent business use of such automobiles. The corporation also deducted 100 percent of all insurance, operating expenses, and maintenance expenses in regard to the two Mercedes automobiles; these expenditures cannot be identified on the tax returns but are included in the lump sum figures for "other deductions" of $220,774 and $288,928, for 1978 and 1979, respectively. On their 1978 and 1979 returns, the Larimores did not report any income from their personal use of the Mercedes automobiles. Mr. Holdner, the corporation's CPA, prepared the returns for both the corporation and the Larimores in 1978 and 1979. In *303 late 1980 or early 1981, respondent's revenue agent, Rita M. McCutcheon (the revenue agent), began auditing the corporation's 1978 and 1979 returns. Mr. Holdner bore primary responsibility for handling the audit for the corporation. The revenue agent reviewed the corporation's books and records at the CPA's office. On March 27, 1981, the revenue agent requested the titles to the Mercedes automobiles. On April 24, 1981, the title to the 450-SL was transferred from the Larimores to the corporation. On April 20, 1981, the revenue agent received from the corporation's CPA a handwritten document that Mr. Larimore had prepared, titled "Admiral Moving and Storage -- Flo's Car Breakdown of Mileage by Month." That handwritten document listed the following uses and mileage each month for the 450-SL: Use
Mileage
Bank deposits
45
Accounting
158
Pick up and deliver help to jobs
105
Supplies
95
To discuss billing problems
140
Deliver estimates (local)
95
Make estimates (local)
60
Long distance trips for estimates
135
Deliver claim forms & discuss claims
95
Other personnel using car
110
1,038
Back and forth to work
440
Total
1,478
The revenue agent *304 asked for and obtained during the audit various corporate repair invoices are records for the Mercedes automobiles. By comparing mileage figures on these documents, she estimated total mileage for the Mercedes automobiles to be just under 19,000 miles each year for the 240-D and about 10,000 in 1978 and about 15,000 in 1979 for the 450-SL. Sometime during December of 1981, while she was still auditing the corporation and the individual petitioners, the revenue agent met with Mr. Larimore and the CPA. At that meeting, Mr. Larimore stated that the 240-D was used 60 percent for business purposes and the 450-SL was used between 10 and 20 percent for business purposes. [11] After the meeting, the revenue agent sent Mr. Larimore a letter dated January 13, 1982, which stated, inter alia, as follows: Based on the lack of record keeping indicating the actual business use of the two Mercedes your oral statement made December 23, 1981 has been accepted. This will allow 60% of the 1978 240D Mercedes expenses to be deductible per Section 162 by your corporation. The 40% disallowed together with the fair market value of the vehicle will be considered a constructive dividend to you. Expenses *305 relating to the 1975 450 SL have been allowable [sic] to the corporation to the extend [sic] of 20%. The 80% disallowed expenses will be considered a dividend together with the Fair Market Value of the vehicle to the extent of 80%. In February of 1982, the corporation sold its moving and storage business. At that time, the corporation still held title to both Mercedes automobiles. By then, the 240-D and the 450-SL had each been driven about 100,000 miles. At that time Mr. Larimore estimated that over the roughly four-year period from the time the corporation acquired the automobiles in early 1978 until the corporation sold its business, the mileage had been put on both automobiles fairly uniformly. Based on this assumption, Mr. Larimore in 1982 prepared a series of four handwritten summaries, one for *306 each of the Mercedes automobiles for each year in issue, estimating the personal use percentages and related expenses for the automobiles. These handwritten summaries were later typed up with a few minor changes and submitted into evidence to explain petitioners' computation of the personal use percentages and the expenses related thereto. [12] Except for the items of insurance and depreciation as to which the parties stipulated, and the items of oil, filters, and maintenance, as to which Mr. Larimore apparently located some corporate invoices and records, there is no evidence to support the other figures and estimates in his summaries. Those summaries are unsupported statements of his position; they lack any evidentiary basis, particularly the total mileage and personal mileage estimates. The depreciation figures, as noted earlier, represent the 100-percent depreciation deductions the corporation claimed on its 1978 and 1979 returns. *307 In the statutory notice of deficiency to the corporation dated October 29, 1982, respondent reduced the corporation's depreciation deductions for 1978 and 1979 by the amounts of $2,400 for 1978 and $3,200 for 1979, determined as follows: 1978
1979
240-D
450-SL
240-D
450-SL
Depreciation claimed by the corporation
$2,000 $2,000 $2,000 $3,000
Personal use of auto determined
by respondent
40%
80%
40%
80%
Disallowed depreciation per auto
$ 800 $1,600 $ 800 $2,400
Total disallowed depreciation for year
$2,400
$3,200
Respondent disallowed other deductions claimed by the corporation for the Mercedes automobiles in the amounts of $1,367 for 1978, and $1,823 for 1979. [13] Respondent also disallowed 40 percent of the investment credit claimed by the corporation on its 1978 return for the 240-D, and 80 percent of the credit claimed for the 450-SL. *308 In the statutory notice of deficiency dated October 29, 1982, to the individual petitioners, respondent increased their gross income for constructive dividends received from the corporation during 1978 and 1979 as follows: 1978
1979
240-D fair rental value
$1,488
$1,488
450-SL fair rental value
2,336
3,504
Automobile expenses paid by
the corporation
1,367
1,823
Total constructive dividends
$5,191
$6,815
OPINION In this case, a wholly-owned corporation purchased two Mercedes automobiles that the sole stockholder and his wife regularly used for both business and personal purposes. One of the vehicles was titled in the corporation's name and one in the individuals' names. Neither the corporation nor the individuals maintained any records as to the business or personal use of these automobiles. The corporation paid and deducted on its tax returns all expenses of operating and maintaining both vehicles. The corporation also claimed depreciation deductions and investment credits based on 100-percent business use of both vehicles. On their tax returns, the individuals did not report any amount as compensation and/or constructive dividend income *309 from the corporation's purchase or their personal use of the Mercedes automobiles. They did pay the corporation $600 each year for their personal use. However difficult it may be to maintain contemporaneous records of business or personal use and expenses for automobiles, litigating such issues is not without its pains. [14]
*310 I The Corporation's Deductions and Credits
Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for compensation paid for personal services actually rendered. The expenses of operating automobiles used in the trade or business are also deductible under section 162. Sec. 1.162-1(a), Income Tax Regs. However, section 262 precludes a deduction for personal, living, or family expenses. Expenses incurred by a taxpayer in traveling between his residence and his regular place of employment are personal commuting expenses and therefore nondeductible. Secs. 1.162-2(e), 1.262-1(b)(5), Income Tax Regs.; Commissioner v. Flowers,326 U.S. 465 (1946); Hynes v. Commissioner,74 T.C. 1266, 1295-1296 (1980). Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear *311 of property used in the trade or business. The taxpayer must own the property or make and maintain a capital investment in property to be entitled to a depreciation deduction with respect to such property. See Miller v. Commissioner,68 T.C. 767, 775 (1977). At all times pertinent to this case, section 38 allowed a credit against Federal income taxes for qualified investment in "section 38 property," as defined in section 48(a)(1). Section 38 property includes tangible personal property with respect to which depreciation is allowable, i.e., property used in a trade or business. Sec. 167(a)(1). If a depreciation deduction is allowable with respect to only a part of the property, then only that part of the property qualifies as section 38 property. Sec. 1.48-1(b)(2), Income Tax Regs.
It is well established that where corporate property is used by a shareholder or a member of his family for purposes not proximately related to the corporate business, the corporation is not entitled to deductions to the extent of such personal use. Falsetti v. Commissioner,85 T.C. 332, 356 (1985). *312 [15] It is incumbent upon taxpayers to keep records sufficient to enable the Commissioner to correctly determine their income tax liability. Sec. 6001. See sec. 1.162-17(d)(2), Income Tax Regs. Here, both the corporation and the individual petitioners failed to keep any records whatsoever pertaining to the business or personal use of the Mercedes automobiles. However, where the Court is convinced that legitimate business expenses were actually incurred by the taxpayers, we may, under appropriate circumstances, approximate the amount of expense deductions the taxpayers are entitled to. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Where, as here, corporate property is used for both business and personal use, an allocation between uses must be made. Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 744 (1973). With these principles in mind, we turn now to the facts of this case. The corporation claimed depreciation deductions and investment credit for the two Mercedes automobiles based *313 on 100-percent business use, and the corporation deducted all expenses of operating and maintaining both vehicles. Respondent disallowed 40 percent of such deductions and investment credit for the 240-D, and 80 percent thereof for the 450-SL, determining that such percentages represented the Larimores' personal use of the automobiles. At trial the issue was raised as to whether some amounts might be additional compensation to the Larimores rather than constructive dividends, hence deductible by the corporation. See n.3, supra.
The 450-SL as Compensation
About three months before the corporation purchased the 450-SL, at an annual stockholders meeting, Mr. Larimore said that he would look for a new auto for Mrs. Larimore "[a]s a bonus for her efforts through the years." During the years in issue, Mrs. Larimore rendered substantial services to the corporation, worked the same long hours that Mr. Larimore did, but received no wages or salary. The 450-SL was purchased with corporate funds, but title to the automobile was registered in the Larimores' names. The Larimores as well as other company employees referred to the 450-SL as "Flo's [Mrs. Larimore's] car." During *314 the years in issue, the Larimores owned no other automobile. Title to the 450-SL remained in the Larimores' names until April 24, 1981, when the Larimores transferred title to the corporation following the revenue agent's request to see the titles to the two Mercedes automobiles. These facts convince us that the 450-SL was purchased by the corporation, and the title thereto was registered in the Larimores' names as payment of compensation for the valuable services Mrs. Larimore rendered to the corporation. The amount of such compensation was reasonable and was equal to the purchase price of the 450-SL, $17,004. Accordingly, the corporation is entitled to a deduction under section 162(a)(1) for compensation paid in the amount of $17,004 for 1978. Consequently, the corporation is not entitled to any depreciation deductions or investment credit for the 450-SL. However, since the 450-SL was used for business purposes, the Larimores are entitled to an investment credit and depreciation deductions for the business use percentage. Business and Personal Use of Both Automobiles
No contemporaneous records of business or personal use having been maintained by either the corporation *315 or the Larimores, we are left with a series of estimates, none wholly satisfactory and some woefully inadequate. This lamentable state of the record prevails even as to total mileage figures per year, something petitioners could have easily documented at the time by simple odometer readings each year. Respondent determined the total annual mileage for the Mercedes automobiles by comparing the mileage shown on various corporate invoices and repair records. See n.13, supra. These figures have the merit of coming from actual corporate records, but there were so few repairs and actual out-of-pocket expenditures by the corporation that the documentation was sparse and sporadic. There is also in the record a handwritten document listing the uses made of the 450-SL during the years in issue and the monthly mileage involved in such uses. Mr. Larimore prepared this handwritten document during the audit (Larimore I). While we might normally reject this as a purely self-serving document, worthy of little weight, the document on its face reflects considerable thought and care in its preparation. Intrinsically, the document reflects completeness in the types and numbers of business *316 trips and distances traveled for each such purpose. The various types of business trips were borne out by the sworn testimony of Mr. and Mrs. Larimore. Since this document was prepared by Mr. Larimore based upon his personal knowlege and offered by respondent, the Court received it in evidence and is inclined to accord it weight as to both business uses and mileage for the 450-SL. According to this document, the 450-SL was driven 1,478 miles each month, [16] or 11,824 miles during 1978 and 17,736 miles during 1979. At trial, however, Mr. Larimore attempted to repudiate his document. He testified that Larimore I was prepared while he was very busy with other corporate matters and prepared without much thought. The document itself, while handwritten, indicates otherwise. What petitioners offered at trial, a neatly typed series of detailed computations (Larimore II), has no evidentiary foundation whatsoever. See n.12, supra. Petitioners do not explain how Mr. Larimore arrived at the figures on this document. *317 [17]
Thus, for total mileage, the Court has three estimates of dubious worth: 450-SL
240-D
1978
1979
1978
1979
Revenue agent
10,419
15,624
18,768
18,768
Larimore I
11,824
17,736
Larimore II
20,360
21,275
25,091
24,972
We conclude that Larimore I, itemizing the miles for the various uses of the 450-SL, is the most reliable estimate for that purpose. Thus, we find as a fact that the 450-SL was driven 11,824 miles during 1978 and 17,736 during 1979. Petitioners provided no evidentiary *318 basis for their estimates of the 240-D's annual mileage. Petitioners having failed to carry their burden of proof, we sustain respondent's determination and find as a fact that the 240-D was driven 18,768 miles each year. [18]Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Having determined total annual mileage for both Mercedes automobiles, we next consider what portions thereof were for business and personal purposes. Respondent determined that the 240-D was used 60 percent for business and 40 percent for personal purposes, and the 450-SL 20 percent for business and 80 percent for personal purposes. Those percentages were based on statements by Mr. Larimore during the audit that the revenue agent simply accepted. Petitioners now contend that *319 the percentage of personal use for the 450-SL was 8.77 percent during 1978 and 9.08 percent during 1979. Similarly, they now claim that the personal use percentage for the 240-D was 10 percent and 11.20 percent, respectively, for each year. Aside from the fact that these figures from Larimore II are wholly lacking in any evidentiary support (see n.12, supra), these figures are completely unrealistic and demonstrably too low. The Larimore II computations show total personal mileage of only 4,311 miles in 1978 and only 4,720 miles in 1979. The Larimores, however, drove 6,000 miles each year just going to and from work. These commuting miles are strictly personal and nondeductible. [19]
*320 Mr. Larimore's earlier itemized listing of monthly mileage for the 450-SL (Larimore I) indicates 440 of the 1,478 miles as personal use per month. These figures yield a business use percentage of 70 percent and personal use of 30 percent. We so find, relying upon Larimore I for the reasons indicated earlier. The finding is borne out to some extent by the oral testimony as to the many business uses of the 450-SL. [20] As to the 240-D we rely upon Mr. Larimore's earlier estimate of 60 percent business and 40 percent personal use, treating that estimate as either an admission by petitioners or a failure to sustain their burden of proof. Welch v. Helvering,supra.
Operating and Maintenance Expenses
As detailed in the findings of fact (see n.13, supra), respondent used the retail price of diesel fuel and gasoline to calculate these expenses. Petitioners *321 argue we should not use the retail price but the wholesale price, since the corporation purchased diesel fuel and gasoline only at wholesale. We agree. Use of average wholesale prices more accurately approximates the corporation's actual expenses. The corporation's average cost for diesel fuel was about $ .40 per gallon during 1978, and about $ .55 per gallon during 1979. [21] The average wholesale price the corporation paid for gasoline was about $ .60 per gallon during 1978, and about $ .75 per gallon during 1979. Thus, we find the corporation incurred fuel expenses of $250.24 and $344.08 for the 240-D and $506.74 and $950.14 for the 450-SL for the years 1978 and 1979, respectively. [22]
*322 Respondent disallowed deductions to the corporation for the personal use percentage of maintenance expenses of $400 each year for the 240-D and $567 and $850, respectively, for the 450-SL. See n.13, supra. The revenue agent determined these figures by calling the largest Mercedes Benz dealer in Oregon to obtain the approximate cost of servicing similar automobiles. Greg Rasmussen, an employee of the dealership, testified at trial that during the years in issue, average routine maintenance expenses for a 240-D during the first 19,000 miles were between $300 and $350, and for the next 17,000 miles were a little higher. Average routine maintenance expenses for a 1975 450-SL for mileage between 15,000 miles and 25,000 miles were between $400 and $600. Petitioners argue that we should not use average maintenance expenses in determining the corporation's expenses. We agree. Both the 240-D and the 450-SL were under warranty during the years in issue, both warranties were quite extensive, and the automobiles ran basically trouble-free. Moreover, either Mr. Larimore or the corporation's mechanic performed the routine maintenance on the automobiles. Mr. Larimore reviewed the *323 corporation's records to determine actual maintenance expenditures. We think petitioners' evidence satisfies their burden of proving error in respondent's determination. We think it clear that the corporation tried to minimize its maintenance expenses by having Mr. Larimore or the corporation's mechanic do whatever work had to be done. Thus, we find the corporation incurred total operating and maintenance expenses for the Mercedes automobiles as follows: 240-D
450-SL
Expense
1978
1979
1978
1979
Fuel
$250.24
$344.08
$506.74
$ 950.14
Maintenance
31.95
33.50
88.54
33.72
Insurance
350.00
350.00
400.00
400.00
Total
$632.19
$727.58
$995.28
$1,383.86
The corporation may deduct the business use percentage of these expenses, which amounts to $1,076.01 for 1978 and $1,405.25 for 1979. [23] However, the corporation must reduce these deductions by $600 each year, the reimbursement paid by the Larimores for their personal use. *324 The corporation is entitled to business expense deductions for the percentage of business use made of the automobiles. Henry Schwartz Corp. v. Commissioner,supra,60 T.C. at 744. However, petitioners argue that the corporation is also entitled to deductions for the personal use percentages of depreciation and operating and maintenance expenses because such amounts represent additional compensation to the Larimores. The corporation, of course, can deduct amounts which are paid as compensation so long as such payments (1) do not exceed reasonable compensation for the services actually rendered and (2) are actually intended to be paid purely for the services. Sec. 1.162-7, Income Tax Regs.; Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974). Petitioners failed to establish that the corporation intended the Larimores' personal use of the Mercedes automobiles to be compensation to them. Petitioners offered no evidence to this effect, nor *325 did the Larimores report any amounts relating to their personal use of the automobiles on their returns as compensation. On this record, we conclude that the Larimores' personal use of the Mercedes automobiles was clearly not intended to be compensation to them. Absent a showing that the amounts were intended as compensation, they are not deductible by the corporation. Electric & Neon, Inc. v. Commissioner,supra,56 T.C. at 1340-1342. In summary, the corporation is entitled to the following deductions or credit for the Mercedes automobiles: Item
1978
1979
450-SL as compensation
$17,004.00 240-D depreciation
* 1,200.00 1,200.00 Operating & maintenance
expenses
1,076.01 1,405.25 Less reimbursements
(600.00)
(600.00)
Total deductions
$18,680.01 $2,005.25 Investment credit -- 240-D ** $574.59 II Income to the Larimores
The next issue is the amount and character of additional income to the Larimores resulting *326 from their receipt of the 450-SL, their personal use of the 240-D, and the corporation's payment of all operating and maintenance expenses for both Mercedes automobiles. Compensation Income
Section 61(a) defines gross income as all income from whatever source derived, including compensation for services. Sec. 61(a)(1). As discussed above, the Larimores must include as compensation income for 1978 the purchase price of the 450-SL, $17,004. Consequently, they need not include in their income the fair rental value of the 450-SL. However, since the 450-SL was used for business purposes, the Larimores are entitled to depreciation deductions and an investment credit to the extent of the business percentage. That amounts to depreciation deductions [24] of $1,400 and $2,100 for 1978 and 1979, respectively, and an investment credit [25] of $793.56 for 1978. Constructive Dividend *327 Income
Under sections 301(a), 301(c)(1) and 316, a distribution of property made by a corporation to a shareholder generally is includable in the shareholder's gross income as a dividend to the extent of the corporation's earnings and profits. [26] A distribution under section 301 may be found even though the corporation has not formally declared a dividend. Crosby v. United States,496 F.2d 1384, 1388 (5th Cir. 1974). It is well settled that where corporate property is used by a shareholder or member of his family for personal purposes, not proximately related to the corporate business, the fair rental value of such property is includable in the shareholder's income as a constructive dividend to the extent of the corporation's earnings and profits. Falsetti v. Commissioner,supra,85 T.C. at 356. *328 The Court of Appeals for the Ninth Circuit, to which any appeal of this case would lie, has held that the fact that corporate payments are not deductible does not automatically result in constructive dividends to a shareholder. Palo Alto Town & Country Village, Inc. v. Commissioner,565 F.2d 1388, 1391 (9th Cir. 1977); Falsetti v. Commissioner,supra,85 T.C. at 356-357. The test for constructive dividends is twofold: Not only must the expenses be nondeductible to the corporation, but they must also represent some economic gain or benefit to the shareholder. Meridian Wood Products Co., Inc. v. United States,725 F.2d 1183, 1191 (9th Cir. 1984); Palo Alto Town & Country Village, Inc. v. Commissioner,supra,565 F.2d at 1391. See also Ireland v. United States,621 F.2d 731, 735 (5th Cir. 1980); Loftin and Woodard, Inc. v. United States,577 F.2d 1206, 1215 (5th Cir. 1978); Ashby v. Commissioner,50 T.C. 409, 417-418 (1968). Thus, where a corporation makes a *329 distribution to a shareholder which serves no legitimate corporate purpose and which results in an economic benefit to the shareholder, such benefit constitutes a constructive dividend to the shareholder to the extent of earnings and profits. Palo Alto Town & Country Village, Inc. v. Commissioner,supra,565 F.2d at 1391; Falsetti v. Commissioner,supra,85 T.C. at 356. We have already determined the nondeductibility of the personal use percentages of the corporation's operating and maintenance expenses for the Mercedes automobiles. Such percentages represent expenses for mileage involved in the Larimores' commuting to and from work and other personal uses of the automobiles. Those percentages of the expenses and the use of the 240-D for personal purposes clearly represent economic benefits bestowed upon the Larimores by the corporation. Thus, the second prong of the constructive dividend test has been satisfied. We now turn to the question of how much constructive dividend income the Larimores must recognize. They argue that the proper measure of the constructive dividends they received is limited to the amount of the out-of-pocket *330 expense deductions disallowed to the corporation, citing Rodgers Dairy Co. v. Commissioner,14 T.C. 66 (1950). In that case, 14 T.C. at 73-74, however, the Court required a shareholder of the corporate taxpayer to include in income a percentage of the corporate taxpayer's depreciation representing his personal use of a corporate automobile. In some respects Rodgers Dairy is an early case decided long before the distinction between actual cost and fair market value was adequately developed. The case nonetheless recognizes that the value of corporate property used by a shareholder is the proper measure of income resulting from such use.The Court specifically stated that the personal use percentage of depreciation was includable in income because it was the approximate value of the taxpayer's personal use of the car. Rodgers Dairy Co. v. Commissioner,supra,14 T.C. at 74. Moreover, it is now well established that the fair rental value of corporate property used for personal purposes is the proper measure of constructive dividends resulting from such use. Falsetti v. Commissioner,supra,85 T.C. at 356; *331 Nicholls, North, Buse Co. v. Commissioner,56 T.C. 1225, 1240-1242 (1971). There are, however, cases supporting the use of costs as an acceptable measure of value when there is no credible evidence of fair market value or when evidence of fair market value is presented but clearly rebutted. Loftin and Woodard, Inc. v. United States,supra,577 F.2d at 1222-1223. However, the equation of value with costs is not the norm but the exception. Loftin and Woodard, Inc. v. United States,supra,577 F.2d at 1223. In the statutory notice of deficiency to the Larimores, respondent included in their income as constructive dividends $1,488 or $124 per month as the personal use percentage of the fair rental value of the 240-D. Respondent's determination is presumptively correct, and the Larimores bear the burden of proving error therein. Welch v. Helvering,supra; Rule 142(a). The Larimores presented no evidence of the 240-D's fair rental value. To support his determination of the 240-D's fair rental value, respondent presented the testimony of Greg Rasmussen, an employee of the largest Mercedes Benz automobile *332 dealer in the State of Oregon. Mr. Rasmussen testified, and we found as a fact, that during the years in issue, a new 1978 240-D cost between $280 and $290 per month to lease. Forty percent of such amounts produce a leasing cost for the Larimores' personal use of the 240-D of between $112 and $116 per month. These figures are close to respondent's determination of $124 per month, but we will reduce the figure to $116. Thus, we sustain respondent's determination to the extent of $1,392 as constructive dividends for each year in issue, representing the 240-D's fair rental value. This amount is exclusive of operating and maintenance expenses. Respondent also included in the Larimores' income as constructive dividends the amount of operating and maintenance expense deductions disallowed to the corporation. The personal use percentages of the expenses paid by the corporation represent additional economic benefits to the Larimores, and therefore constitute constructive dividends to them, in the total amounts of $551.46 for 1978 and $706.19 for 1979. [27] However, the Larimores may reduce their constructive dividend income by the $600 they reimbursed the corporation each year for their *333 personal use of the Mercedes automobiles. In summary, the Larimores must include in income and may deduct the following: Item
1978
1979
Compensation
450-SL purchase price
$17,004.00 $17,004.00 Constructive dividends
240-D fair rental value
$ 1,392.00 $1,392.00 Operating and maintenance
expenses paid by the
corporation
551.46 706.19 1,943.46 Total
$18,947.46 $2,098.19 Deductions
Depreciation -- 450-SL
(1,400.00)
(2,100.00)
Reimbursements
to corporation
( 600.00)
( 600.00)
Total
(2,000.00)
(2,700.00)
Investment credit -- 450-SL
( 793.56)
( 793.56)
The Larimores may also be entitled to dividend exclusions as provided in section 116. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
2. The corporate petitioner's deficiency for 1975 results from respondent's disallowance of a carryback of petitioner's unused new jobs credit for 1978 in such amount. Respondent disallowed the carryback because his reduction of petitioner's 1978 investment credit eliminated the new jobs credit carryback. ↩
3. The statutory notice of deficiency treated as constructive dividends to the individual petitioners the rental value of both automobiles and certain expenses paid by the corporation. At the commencement of the trial, the Court raised the possibility that some amounts could be compensation to the individual petitioners and thus deductible by the corporate petitioner. At the conclusion of the trial, respondent's counsel moved to amend the pleadings to conform to the proof to allege that if the payments in regard to the Mercedes were not constructive dividends to Mrs. Larimore that they were income to her. The Court responded as follows: Well, the Court had asked the question about that at the outset because it appeared to me that both sides seemed to be overlooking what seemed to the Court to be an alternative position that would give the corporation its deduction but have the amount includable in the individual's income, and particularly since it is now clearly established for the record that Mrs. Larimore did in fact work for the corporation, which had not been clear at the outset. There's certainly no question about reasonable compensation since she got zero. Anything above that would clearly be reasonable, so I would just suggest instead of formally amending the pleadings that both sides should address the issue in their briefs. Respondent did address the issue on brief; petitioners alluded to the issue but did not really discuss it. Since the factual record has been fully developed by the parties and since the compensation vs. dividend issue was raised at the outset of the trial, albeit by the Court itself, the Court considers this issue properly before the Court despite the lack of formally amended pleadings. The Court itself, in its effort to simplify matters and to foster an environment for settlement of the case after trial (n.14, infra↩), is responsible for the fact that the pleadings were not formally amended. Accordingly, the Court will treat the case as if the answer had been amended and petitioners had denied the allegations. The compensation issue being "new matter," respondent will of course bear the burden of proof. Rule 142(a). If the Court finds any increased compensation to the individuals, it will allow a corresponding deduction to the corporation.
4. At the trial of this case, George W. Tombe testified that during 1978 and 1979, he was employed by the corporate petitioner. He testified at length about various aspects of the corporation's operations in those years, particularly in regard to use of the two Mercedes automobiles. Three months after the trial, respondent filed a motion to reopen the record for the purpose of admitting into evidence Mr. Tombe's tax returns and his affidavit so that the Court could strike his testimony as irrelevant, incompetent, and inadmissible. The tax returns and Mr. Tombe's affidavit establish that Mr. Tombe was not employed by the corporate petitioner during 1978 or 1979. After receiving petitioners' objection to respondent's motion, the Court denied respondent's motion to reopen the record to strike Mr. Tombe's testimony. However, the Court has not relied upon his testimony in making its findings of fact. To a large extent, Mr. Tombe's testimony duplicated that of the individual petitioners.↩
5. Mr. Larimore testified that she was paid no salary because the corporation was a struggling young company, and because of the competitive nature of its market area, its earnings were plowed back into the business. He further testified that the corporation simply did not have the money to pay her a salary. The Court does not accept this testimony. The business was incorporated in 1972, and reported taxable income of $38,874 and $24,730 in 1978 and 1979, respectively. Also the corporation purchased the two Mercedes automobiles in 1978.↩
6. The corporation was required to recapture part of the investment credit claimed earlier for these cars because they were disposed of before the expiration of their useful lives. While the Court was favored with detailed testimony about the poor condition of the cars the corporation retained, the record is conspicuously silent as to the condition of the 1973 Mercedes and the Datsun 280Z that were sold in 1978.↩
7. Mr. Larimore testified that the 450-SL was titled in his wife's name temporarily. That is not correct. He further testified it was titled in her name because the corporation was in the process of changing the major van lines with which it was affiliated, which would require a change in the corporation's name, and the corporation did not want to register the title to the 450-SL in its name and then have to change the registration after its corporate name change. The Court did not believe this explanation. The same argument could be made as to the 240-D but that vehicle was titled in the name of Beaverton Transfer Co., Inc., the old corporate name.In any event, the corporation changed its name on September 29, 1980, but the title to the 450-SL (in the names of both Mr. and Mrs. Larimore) was not changed until after the Internal Revenue Service asked to see the title during the audit.↩
8. Neither party considered the value of their company time and labor as either an expense to the corporation or an additional dividend to Mr. and Mrs. Larimore. The Court will disregard the item as de minimis.↩
9. The parties stipulated to these figures. The calculations are not accurate. $14,364 X .6667 = $9,576.48. $17,004 X .6667 = $11,336.57. $9,576.48 + $11,336.57 = $20,913.05. $20,913.05 X 10 percent = $2,091.31.↩
10. The parties stipulated to these figures without any explanation as to the basis for computation. The 1978 and 1979 corporate returns showed total of depreciation of $17,908 and $16,519, respectively, for "transportation equipment," which we assume includes the automobiles as well as the moving vans.↩
11. However, at the trial, Mr. Larimore stated he could not remember whether he made this statement. The CPA testified that these percentages were discussed at the meeting but were suggested by the revenue agent. The CPA further testified he did not agree with such figures. The Court found the revenue agent's testimony more credible than that of Mr. Larimore or the CPA.↩
12. The figures set forth on petitioners' typewritten summaries are as follows: 240-D
450-SL
Item
1978
1979
1978
1979
Total miles
25,091
24,972
20,360
21,275
Personal miles
2,526
2,788
1,785
1,932
Business miles
22,565
22,184
18,575
19,343
Personal miles divided by total miles. [1]Personal use percentage 10.00%
11.20%
8.77%
9.08%
For the 240-D, total miles divided by 30 miles per gallon, times $ .40 per gallon of diesel fuel for 1978, and $ .55 per gallon for 1979. For the 450-SL, total miles divided by 14 miles per gallon, times $ .60 per gallon of gasoline for 1978, and $ .75 per gallon for 1979. [2]Fuel $ 333.33
$ 458.33
$ 872.56
$1,139.73
Oil, filters, and
maintenance
31.95
33.50
88.54
33.72
Insurance
350.00
350.00
400.00
400.00
Depreciation
2,000.00
2,000.00
2,000.00
3,000.00
Total expenses
$2,715.28
$2,841.80
$3,361.10
$4,573.45
Personal use
percentage of
Total expenses times personal use percentage.
[3]total expenses $ 271.52
$ 318.28
$ 294.76
$ 415.26
There are numerous computational and rounding errors in the above figures, too many to itemize. Despite the seeming precision of these summaries, there is little or no evidence in the record to support these figures. Accordingly, except as expressly noted in the text, we accord them no weight. ↩
13. The breakdown of these figures is not part of the evidentiary record. Respondent attached the breakdown to his trial memorandum, used the document to refresh the revenue agent's recollection at trial, but never offered it. Since this breakdown, like Mr. Larimore's summaries (n.12, supra), is just a statement of position, the Court includes it merely to show respondent's computations: 450-SL
1978
1979
Mileage
10,419 15,624 MPG
14 14 Gallons used
744 1,116 Price per gallon
$ .95 $ .95 Fuel expense
$707 $1,060 Maintenance expense
567 850 Total expense
$1,274 $1,910 Less 20% business use
(255)
(382)
Total
$1,019 $1,528 240-D
Mileage
18,768 18,768 MPG
30 30 Gallons used
626 626 Price per gallon
$ .75 $ .75 Fuel expense
$470 $470 Maintenance expense
400 400 Total expense
$870 $870 Less 60% business use
(522)
(522)
Total
$348 $348 450-SL fuel & maintenance
$1,019 $1,528 240-D fuel & maintenance
348 348 240-D insurance
344 322 450-SL insurance
263 225 Less reimbursement
(600)
(600)
Total disallowed
60 percent of $2,000 total depreciation claimed ** $14,364 purchase price X 66.67 percent applicable percentage X 60 percent business use percentage X 10 percent regular percentage
* $1,374 $1,823 * This figure is erroneously shown in the statutory notice of deficiency as $1,367.↩
14. Even at the conclusion of the trial, the Court urged the parties to try to settle this case, expressing the view that the case could have been settled had petitioners' counsel been in the case from the beginning. Petitioners did not retain counsel until the first day of the two-day trial. Despite that handicap, petitioners' counsel tried the case in a thoroughly competent, professional manner. Regrettably the parties could not or would not settle after trial. The post-trial environment for settlement, which the Court tried to foster, may have been poisoned by an unfortunate incident of tainted evidence. After trial, respondent discovered that one of petitioners' witnesses who testified he worked for the corporation during 1978 and 1979, and who testified at length about the business use of the vehicles in those years, did not in fact work for the company at that time. While the Court did not grant respondent's motion to reopen the record to strike Mr. Tombe's testimony, the Court has not relied upon it in its findings of fact. See n.4, supra.↩ However, the Court is satisfied that petitioners' counsel, as he advised the Court, had no knowledge at the time of the trial of the Tombe matter.
15. See also Whipple Chrysler-Plymouth v. Commissioner,T.C. Memo. 1972-55↩, and cases cited therein.
16. The corporation acquired the 450-SL on April 24, 1978, so it was used approximately eight months during 1978. 8 X 1,478 = 11,824. For 1979, 12 X 1,478 = 17,736.↩
17. The only evidence petitioners submitted to support Larimore II was Mr. Larimore's testimony that by the time the corporation sold its business in February of 1982, both automobiles had been driven about 100,000 miles, that 100,000 miles divided by four years yields a mileage estimate for the 240-D of roughly 25,000 miles per year, and that 100,000 miles less the 15,000 miles that were already on the 450-SL when purchased, or 85,000 miles, divided by four years yields an estimated annual mileage figure for it of 21,250 miles. That does not begin to explain the precise figures in Larimore II, and the document is not otherwise self-authenticating.↩
18. The revenue agent testified that from the corporate invoice and repair records she determined total mileage of just under 19,000 for each year. Her computations were used to refresh her recollection but not offered in evidence. See n.13, supra.↩ The computation is just a statement of respondent's position, but we will use the exact figure of 18,768 since this was used for the notice of deficiency.
19. The corporation improperly treated all of the Larimores' commuting mileage as business use. The testimony of both the Larimores and the CPA conveyed a disturbing impression that they thought driving to and from work somehow becomes a deductible business expense if any business errand is performed along the way. That is not correct. The Larimores have totally failed to show that they would not have driven the same mileage for commuting and incurred the same expenses without regard to any business stops enroute. See Fausner v. Commissioner,413 U.S. 838 (1973); Feistman v. Commissioner,63 T.C. 129↩ (1974).
20. While the Court cannot understand why an automobile that gets only 14 miles to the gallon would be used so extensively for business purposes, the Court is persuaded that it was. Respondent has not raised any issue as to whether the expenditures were excessive and hence not ordinary and necessary.↩
21. The parties stipulated that the wholesale price for diesel fuel both years was about $ .40 per gallon. However, after reviewing the corporation's records, Mr. Larimore testified that the corporation's average cost for diesel fuel was about $ .40 per gallon during 1978 and about $ .55 per gallon during 1979. The Court will not lightly disregard a fact agreed to by the parties in the stipulation. Jasionowski v. Commissioner,66 T.C. 312, 318 (1976). However, in unusual circumstances, when a stipulated fact is clearly contrary to the record presented to us at trial, the Court will not be bound by the stipulation. Mead's Bakery, Inc. v. Commissioner,364 F.2d 101 (5th Cir. 1966), affg. on this issue and reversing on other issues a Memorandum Opinion of this Court; Jasionowski v. Commissioner,supra,66 T.C. at 318↩. Here, the evidence of record appears to be more specific, and to a large extent supplements rather than contradicts, the parties' stipulation. We have made our finding based on the record as a whole. 22. For each vehicle, this is computed by dividing the total mileage each year by the miles per gallon for the particular vehicle times the wholesale price for diesel fuel or gasoline (whichever was applicable) for the year.↩
23. 1978
Total
Business
Amount
Automobile
Expenses
Use Percentage
Deductible
240-D $632.19
X
60%
=
$ 379.31
450-SL
995.28
X
70%
=
696.70
$1,076.01
↩
1979
Total
Business
Amount
Automobile
Expenses
Use Percentage
Deductible
240-D $727.58
X
60%
=
$ 436.55
450-SL
1,383.86
X
70%
=
968.70
$1,405.25
24. 70 percent X $2,000 = $1,400; 70 percent X $3,000 = $2,100. ↩
25. $17,004 purchase price X 66.67 percent applicable percentage X 70 percent business use X 10 percent regular percentage = $793.56.↩
26. Petitioners presented no evidence regarding the corporation's earnings and profits. They therefore failed to meet their burden of proving that any distributions the corporation made to the Larimores were not out of the corporation's earnings and profits and thus are not taxable as ordinary dividend income under sections 301(c)(1), 316(a), and 61(a)(7)↩.
27. See n.23, supra. The Larimores' constructive dividend income is the 40 percent and 30 percent usage disallowed to the corporation for each vehicle: ↩
1978
1979
240-D
252.88
291.03
450-SL
298.58
415.16