T.C. Summary Opinion 2017-39

UNITED STATES TAX COURT

REZA ZIA-AHMADI AND RACHELLE L. ZIA-AHMADI, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

SOUND DIAGNOSTIC IMAGING INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 23635-13S, 23636-13S.          Filed June 14, 2017.

Reza Zia-Ahmadi and Rachelle L. Zia-Ahmadi, pro se in docket No. 23635-13S.

Reza Zia-Ahmadi (an officer), for petitioner in docket No. 23636-13S.

Miles B. Fuller, for respondent.

SUMMARY OPINION

PARIS, <u>Judge</u>:  These cases have been consolidated for trial, briefing, and opinion.  These consolidated cases were heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petitions were filed.[1]  Pursuant to section 7463(b), the decisions to be entered are not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent issued to Sound Diagnostic Imaging, Inc. (Sound Diagnostic), a notice of deficiency determining deficiencies in Federal corporate income tax of $11,447 and $18,529 and accuracy-related penalties of $2,289.40 and $3,705.80 for 2009 and 2010,[2] respectively.[3]  Before trial respondent filed a first amendment to answer, increasing Sound Diagnostic's deficiencies to $18,977 and $25,073 and its accuracy-related penalties to $3,795 and $5,015 for 2009 and 2010, respectively.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Sound Diagnostic is a calendar year taxpayer.

[3]Sound Diagnostic did not raise the general business credit for alternative refueling property in the petition or at trial.  <u>See</u> Rule 34(b)(4) ("Any issue not raised in the assignments of error shall be deemed to be conceded.").  That issue with not be discussed further.

Respondent issued to Mr. and Mrs. Zia-Ahmadi[4] (petitioners) a notice of deficiency determining deficiencies in Federal individual income tax of $6,816 and $18,036 and accuracy-related penalties of $1,363.20 and $3,607.20 for 2009 and 2010, respectively.  Before trial respondent filed a first amendment to answer, increasing petitioners' deficiencies to $11,470 and $34,918 and their accuracy-related penalties to $2,294 and $6,984 for 2009 and 2010, respectively.

## Background

Some of the facts are stipulated and are so found.  The first stipulation of facts, the first supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference.  Petitioners resided in Colorado and Sound Diagnostic had its principal place of business in Colorado when their respective petitions were timely filed.

I.    Sound Diagnostic

Sound Diagnostic is a C corporation, originally incorporated on May 1, 2006.  Petitioners are the sole shareholders of Sound Diagnostic--Mrs. Zia-Ahmadi owns 51% and Mr. Zia-Ahmadi owns 49%.  Mr. Zia-Ahmadi is the president of Sound Diagnostic.  Sound Diagnostic paid petitioners $30,500 each in

---

[4]Mrs. Zia-Ahmadi did not appear for calendar call or trial, but she will be bound by the Court's decision.

wages in 2009 and 2010.[5]  Petitioners were Sound Diagnostic's only employees in 2009 and 2010.

### A.    Ultrasound Services

Sound Diagnostic provided ultrasound services to medical offices and clinics throughout southern Colorado.  Sound Diagnostic entered into professional service agreements with three medical clinics (professional service agreements) in 2009 and 2010.  Under the professional service agreements, Sound Diagnostic contracted to provide ultrasound machines and "licensed medical professionals" qualified to perform echocardiography, cardiovascular, and vascular ultrasound services in the medical field of cardiology.

Mr. Zia-Ahmadi, either personally or by arranging contract labor, was responsible for providing Sound Diagnostic's ultrasound services for the years in issue.  Mrs. Zia-Ahmadi did not perform any ultrasound services but did perform Sound Diagnostic's bookkeeping, recordkeeping, and banking.  Both petitioners signed checks drawn on Sound Diagnostic's bank account in 2009 and 2010.

---

[5]The wages paid to petitioners were reported as compensation to officers on Sound Diagnostic's 2009 and 2010 Forms 1120, U.S. Corporation Income Tax Return.  The record does not indicate Mrs. Zia-Ahmadi's corporate officer position for 2009 and 2010.

B.    Equipment Leases

Sound Diagnostic did not own ultrasound equipment. Petitioners' limited liability company, AZR Equipment Leasing LLC (AZR), owned two mobile ultrasound machines and leased them to Sound Diagnostic.[6] Under one equipment lease Sound Diagnostic agreed to pay AZR monthly rent of $5,500. Under a second equipment lease Sound Diagnostic agreed to pay AZR monthly rent of $5,900. The equipment lease payments due from Sound Diagnostic to AZR under the equipment leases totaled $136,800 for each year in issue. Under both equipment leases AZR reserved the right to charge a late payment penalty equal to 1% of the overdue rent payment, along with other rights of default, if the rent payment was not made by the 10th of the month.

Sound Diagnostic was delinquent in its payments to AZR due under the equipment leases during both years in issue. Sound Diagnostic did not issue a promissory note to AZR for outstanding balances with respect to the delinquent equipment lease payments. The record does not reflect that AZR charged late payment penalties for the overdue rent payments or exercised any of its other default rights.

---

[6]See infra p. 9.

In 2009 and 2010 Sound Diagnostic's only bank account was with Sunflower Bank. In 2009 Sound Diagnostic made payments of $89,915 to AZR under the equipment leases but deducted lease payments of $101,165 on its 2009 return. In 2010 Sound Diagnostic made payments of $108,500 to AZR under the equipment leases but deducted lease payments of $139,000 on its 2010 return.

C.     Payment of Petitioners' Personal Expenses

Sound Diagnostic paid petitioners' personal expenses in both years in issue. Sound Diagnostic recorded these as shareholder draws in its general ledger using a code "555". In 2009 Sound Diagnostic recorded shareholder draws of $17,961.83 by petitioners. In 2010 Sound Diagnostic recorded shareholder draws of $52,782.40 by petitioners.[7] Petitioners assert that the payments of their personal expenses were booked as draws from Sound Diagnostic but that some of them were treated as unpaid equipment lease payments from Sound Diagnostic to AZR.

D.     Use of Automobiles

The professional service agreements required the ultrasound equipment to be transported to each of the medical clinics. Sound Diagnostic did not own any

---

[7]Petitioners' opening brief asserts that Sound Diagnostic set up a loan to shareholders and that there were promissory notes that petitioners' accountant provided to the IRS examiner. Those promissory notes were not included in the record.

automobiles, but Mr. Zia-Ahmadi used his personal automobile to perform his work as an employee of Sound Diagnostic, which included transporting the ultrasound equipment.  Mr. Zia-Ahmadi did not keep contemporaneous records of the miles he drove to perform his work as an employee of Sound Diagnostic.

E.   2009 and 2010 Tax Returns, the Notice of Deficiency, and the First Amendment to Answer

Sound Diagnostic reported gross receipts of $488,558 and claimed deductions of $462,772 on its 2009 return.  It also reported the loans to shareholders with a starting balance of $426 on January 1, 2009, and an ending balance of $33,172 on December 31, 2009.[8]

Sound Diagnostic reported gross receipts of $493,720 and claimed deductions of $454,450 on its 2010 return.  It also reported the loans to shareholders with a starting balance of $33,172 on January 1, 2010, and an ending balance of $24,193 on December 31, 2010.[9]  Sound Diagnostic calculated its tax liabilities at the reduced graduated corporate tax rate of 15% for 2009 and 2010. A tax return preparer prepared Sound Diagnostic's returns for years in issue.

_____

[8]See supra note 7.

[9]See supra note 7.

For 2009 respondent in the notice of deficiency disallowed Sound Diagnostic's deductions for: (1) equipment lease payments of $14,426 and (2) office supplies expenses of $4,440.[10] For 2010 respondent in the notice of deficiency disallowed the deduction for equipment lease payments of $30,500. Respondent calculated Sound Diagnostic's tax liabilities at the corporate tax rate of 35%.

In his first amendment to answer, respondent asserted increased deficiencies of $18,977 and $25,073 for Sound Diagnostic and accuracy-related penalties of $3,795 and $5,015 for 2009 and 2010, respectively. The increased deficiencies reflect the following: (1) an increased disallowance of the deduction for equipment lease payments of $24,828 for 2009[11] and (2) disallowance of deductions for vehicle expenses of $11,112 and $18,698 for 2009 and 2010, respectively.

---

[10]At trial respondent reduced the disallowance for office supplies to $4,314 for 2009 and conceded that Sound Diagnostic was entitled to a depreciation deduction for computer equipment of $4,314 for 2009.

[11]In the notice of deficiency respondent determined an overstated equipment lease payment deduction of $14,426 for 2009. See supra p. 7.

II.    AZR

Petitioners organized AZR on May 1, 2006, as a Colorado limited liability company and caused it to elect to be treated as a partnership.  Petitioners each own 50% of AZR.

    A.    Equipment Finance Lease Payments and Payment of Petitioners' Personal Expenses

The parties stipulated that AZR's only assets during the years in issue were the two ultrasound machines referenced in the equipment leases with Sound Diagnostic.  The ultrasound machines referenced in the equipment leases, however, were purchased by Mr. Zia-Ahmadi under finance leases.[12]

Mr. Zia-Ahmadi contributed the ultrasound equipment to AZR, and AZR assumed Mr. Zia-Ahmadi's liabilities under the leases.  AZR reported as a debit on its balance sheet dated December 31, 2009, a note of $65,167.07 payable to the

---

[12]The first stipulation of facts states that AZR purchased the ultrasound machines.  The parties also stipulated, however, two finance leases that have Mr. Zia-Ahmadi as the purchaser of the ultrasound machines.  On one of the leases Mr. Zia-Ahmadi is the lessee of one of the ultrasound machines, and on the second lease Reza Zia-Ahmadi d.b.a. Reza Zia-Ahmadi Ultrasound Tech is the lessee of the other ultrasound machine.  Accordingly, the Court will disregard the parties' stipulation that AZR purchased the ultrasound machines, see Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989) (disregarding a stipulation as inconsistent with a stipulated exhibit), and instead find that Mr. Zia-Ahmadi contributed the ultrasound machines to AZR.

finance company. AZR also reported as a debit on its balance sheet dated December 31, 2010, a note of $39,687.62 payable to the same finance company.

For 2009 and 2010 AZR's only source of income was Sound Diagnostic's payments to it pursuant to the equipment leases. In 2009 and 2010 AZR's only bank account was with Sunflower Bank. AZR deposited equipment lease payments received from Sound Diagnostic into that bank account. AZR did not maintain any additional records regarding the receipt of Sound Diagnostic's equipment lease payments. AZR made petitioners' automobile payments and paid some of petitioners' other personal expenses totaling $27,726 and $102,442 for 2009 and 2010, respectively.

B.  AZR's 2009 and 2010 Tax Returns

For 2009 AZR reported rent payments of $89,915 from the equipment leases with Sound Diagnostics on Form 8825, Rental Real Estate Income and Expenses of a Partnership or an S Corporation, attached to its Form 1065, U.S. Return of Partnership Income. AZR also reported expenses of $36,893, which included interest of $11,752 and depreciation of $5,543, on the Form 8825. AZR reported its net income of $53,022 as net rental real estate income.[13]

---

[13]Petitioners reported their shares of AZR's net income of $53,022 as "nonpassive income from Schedule K-1" on the Schedule E, Supplemental Income

(continued...)

For 2010 AZR reported rent payments of $139,000 from the equipment leases with Sound Diagnostic on a Form 8825 attached to its Form 1065.[14] However, AZR received rent payments of only $108,500 from Sound Diagnostic in 2010. AZR also reported expenses of $68,028, which included interest of $11,255, depreciation of $27,663, and lease payments for the ultrasound equipment of $19,307, on the Form 8825. AZR reported its net income of $70,972 as rental real estate income.[15]

III. Petitioners

A. Petitioners' Automobiles

In 2008 Mr. Zia-Ahmadi purchased an Audi RS4. The purchase of the RS4 was financed through a loan from Sunflower Bank with the borrowers stated as

---

[13](...continued)
and Loss (From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.), attached to their 2009 Form 1040, U.S. Individual Income Tax Return.

[14]The total equipment lease payments due under the Sound Diagnostic lease were $136,800. Although AZR's reported rent payments of $139,000 matched Sound Diagnostic's reported equipment lease expense for 2010, petitioners did not offer any explanation for the additional amount reported.

[15]Petitioners reported their shares of AZR's net income of $70,972 as "nonpassive income from Schedule K-1" on the Schedule E attached to their 2010 Form 1040.

AZR, Sound Diagnostic, and Mr. Zia-Ahmadi.[16] Mr. Zia-Ahmadi signed as "CFO" for both AZR and Sound Diagnostic and pledged as collateral a secured interest in AZR's ultrasound equipment. Mr. Zia-Ahmadi primarily drove the RS4 and used it in carrying on his work for Sound Diagnostic. The RS4's title was not offered into evidence.

For 2009 and 2010 AZR made monthly payments of $1,011.07 labeled "Loan Payment" to Sunflower Bank. The $1,011.07 monthly payment was the amount due to Sunflower Bank under the promissory note executed by AZR, Sound Diagnostic, and Mr. Zia-Ahmadi for the purchase of the RS4. AZR made total payments to Sunflower Bank during 2009 and 2010 of $24,265.68.

On December 14, 2009, Mr. Zia-Ahmadi purchased an Audi Q7. Mrs. Zia-Ahmadi primarily drove the Q7. It was not used to conduct Sound Diagnostic's business.

In March 2010 Mr. Zia-Ahmadi sold the RS4 to an unrelated party for $45,500, and he deposited the proceeds into AZR's bank account. Mr. Zia-Ahmadi was the only "seller" stated on the sale agreement. On April 19, 2010, Mr. Zia-Ahmadi withdrew $43,727.85 from AZR's Sunflower Bank account to

---

[16]Mrs. Zia-Ahmadi is listed as a borrower on the Sunflower Bank credit application for the RS4, but she is not listed as a borrower on and did not sign the promissory note for the RS4.

use as a downpayment for the purchase of an Audi R8. Mr. Zia-Ahmadi financed the purchase as the only borrower. Mr. Zia-Ahmadi did not use the R8 to perform his work for Sound Diagnostic. Petitioners conceded that none of their automobiles were AZR's assets.

B.    Petitioners' 2009 and 2010 Returns, the Notice of Deficiency, and the First Amendment to Answer

On their 2009 joint Federal income tax return petitioners reported wages of $61,000 from Sound Diagnostic and income of $53,022 from AZR.[17] Petitioners did not report any net earnings from self-employment for 2009. Petitioners also claimed on Schedule A, Itemized Deductions, "New motor vehicle taxes" of $1,782 and personal property tax of $3,518 for 2009.

On their 2010 joint Federal income tax return[18] petitioners reported wages totaling $61,000 from Sound Diagnostic and net income of $70,972 from AZR.[19] Petitioners did not report any net earnings from self-employment for 2010.

---

[17]AZR reported on the 2009 Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., that petitioners were both "general partners or LLC member managers" and "passive individual partners".

[18]In 2010 petitioners had their fourth child. Respondent has conceded that petitioners had a fourth qualifying child in 2010 who was not previously claimed as a dependent on their 2010 joint Federal income tax return.

[19]AZR reported on the 2010 Schedules K-1 that petitioners were both "general partners or LLC member managers" and "passive individual partners".

Petitioners also claimed a Schedule A deduction for an ownership tax[20] of $3,498. The same tax return preparer who prepared Sound Diagnostic's returns prepared petitioners' returns for the years in issue.

Respondent issued to petitioners a notice of deficiency in which he increased AZR's net passthrough income by $119, consisting of decreased gross receipts of rent from the equipment leases of $3,176 and a disallowed interest expense deduction of $3,295 for 2009. Respondent also increased AZR's net passthrough income by $16,735, consisting of decreased gross receipts of rent from the equipment leases of $30,500, disallowed interest expense deductions of $5,808, disallowed depreciation of $22,120, and disallowed lease expense deductions of $19,307 for 2010.[21]

In his first amendment to answer, respondent asserted increased deficiencies of $4,654 and $16,882 for petitioners and accuracy-related penalties of $930.80 and $3,376.80 for 2009 and 2010, respectively. The increased deficiencies reflect

[20]Colorado levies an annual ownership tax in lieu of property tax on registered vehicles. Colo. Rev. Stat. sec. 42-3-106 (2010).

[21]The increased amounts of passthrough income of $119 and $16,735 for 2009 and 2010, respectively, are stated as such on Form 4605-A, Examination Changes - Partnerships, Fiduciaries, S Corporations, and Interest Charge Domestic International Sales Corporations (Unagreed and Excepted Agreed). The increased amounts of passthrough income are listed as $118 and $16,736 for 2009 and 2010, respectively, on Form 886-A, Explanation of Items.

the following: (1) receipt of dividends from Sound Diagnostic of $22,332 and $56,499 in 2009 and 2010, respectively;[22] (2) distributions from AZR of $37,756 and $67,071 in 2009 and 2010, respectively;[23] and (3) distributions that exceeded petitioners' bases in AZR by $26,277 in 2010.[24]

## Discussion

### I. Burden of Proof

The Commissioner's determination of a deficiency in tax is presumptively correct. Welch v. Helvering, 290 U.S. 111, 115 (1933). Generally, the burden of proof is on the taxpayer to show that the Commissioner has erred in his determination. Rule 142(a)(1). That presumption, however, applies only to the determinations in the statutory notice of deficiency.

If the Commissioner asserts an increased deficiency or new matter after the notice of deficiency is issued, then the burden of proof as to the increased deficiency or new matter is on him. Rule 142(a)(1); Wayne Bolt & Nut Co. v.

---

[22]On brief respondent conceded that the unreported dividends are $17,962 and $52,782 for 2009 and 2010, respectively.

[23]On brief respondent requested a finding of fact that the distributions from AZR are $27,726 and $102,442 for 2009 and 2010, respectively.

[24]On brief respondent conceded that the distribution in excess of petitioners' bases was $4,666 for 2010.

Commissioner, 93 T.C. 500, 507 (1989). Respondent increased the deficiencies and added new matter in the first amendments to answer for Sound Diagnostic and petitioners. Therefore, respondent has the burden of proof with respect to the increased deficiencies and the new matter. See Rule 142(a).

II.     Sound Diagnostic

The Court must decide with respect to Sound Diagnostic whether: (1) it is entitled to a deduction claimed for equipment lease payments of $101,165 and $139,000 for 2009 and 2010, respectively, versus the $89,915 and $108,500 it actually paid to AZR; (2) it is entitled to deduct vehicle expenses with respect to certain automobiles of $11,112 and $18,698 for 2009 and 2010, respectively; (3) it should be taxed as a personal service corporation at the corporate tax rate of 35% for 2009 and 2010; and (4) it is liable for accuracy-related penalties for 2009 and 2010.

     A.     Sound Diagnostic's Equipment Lease Payments and Vehicle Expense
        Deductions

Deductions are a matter of legislative grace. Section 162(a) permits a taxpayer to deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business. See Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971). A trade or business expense is ordinary if it is normal or

customary within a particular trade, business, or industry, and it is necessary if it is appropriate and helpful for the development of the business. Commissioner v. Heininger, 320 U.S. 467, 471 (1943); Welch v. Helvering, 290 U.S. at 113-114. A taxpayer ordinarily must maintain adequate records to substantiate the amounts of his or her income and entitlement to any deductions or credits claimed. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Personal, living, or family expenses, however, are generally nondeductible. Sec. 262(a).

### 1. Equipment Lease Payments for 2009 and 2010

The equipment lease payments were ordinary and necessary expenses of Sound Diagnostic. Despite Mr. Zia-Ahmadi's intention to operate the ultrasound business between two separate entities, Sound Diagnostic and AZR, the actual operations did not always respect the existence of these separate entities. Sound Diagnostic paid some of petitioners' personal expenses and did not make lease payments to AZR timely. Petitioners claim that the substance of the payments for personal expenses was to cover shortfalls in the monthly lease payments that Sound Diagnostic was required to make to AZR.

For 2009 and 2010 AZR had the right under the equipment leases to charge Sound Diagnostic a late fee, to take back possession of the ultrasound machines, or to terminate the equipment leases. AZR did not do any of that. The lack of

action by AZR indicates that it did not treat Sound Diagnostic's payments as insufficient or late. The record, therefore, supports as the allowable deduction for 2009 only the amount AZR was paid as rent from the equipment leases, $89,915, and not the amount due under the equipment leases.

For 2010 payments recorded in Sound Diagnostic's bank statements for equipment lease payments totaled $108,500, and AZR claimed rent payments of $139,000 from the equipment leases. The total amount of equipment lease payments due under the equipment leases for 2010 was $136,800. The Court finds Sound Diagnostic's deduction for lease payments limited to $108,500 for 2010, the amount it actually paid AZR.

### 2. Vehicle Expenses for 2009 and 2010

Respondent denied Sound Diagnostic's claimed deductions for vehicle expenses in his amendment to answer. The Court determines that in regard to this new matter, respondent has met his burden of proof. Sound Diagnostic did not own any automobiles during the years in issue; thus it cannot claim deductions for any vehicle expenses. See Siragusa v. Commissioner, T.C. Memo. 1980-68 (holding that a taxpayer could not deduct vehicle expenses for a borrowed car); see also Rev. Proc. 2008-72, 2008-2 C.B. (Vol. 2) 1286, 1288 ("A taxpayer may use the business standard mileage rate with respect to an automobile that is either

owned or leased by the taxpayer." (Emphasis added.)).[25] Therefore, Sound Diagnostic is not entitled to vehicle expense deductions for automobiles for 2009 and 2010.

### B. Personal Service Corporation in 2009 and 2010

Generally, C corporations are taxed at graduated income tax rates. Sec. 11(b)(1). If, however, a C corporation is a qualified personal service corporation under section 448(d)(2), it will be taxed at a flat 35% income tax rate. Sec. 11(b)(2). A C corporation will be treated as a qualified personal service corporation if two tests are satisfied: (1) a function test and (2) an ownership test. Sec. 448(d)(2)(A) and (B); sec. 1.448-1T(e)(3), (4), and (5), Temporary Income Tax Regs., 52 Fed. Reg. 22768 (June 16, 1987) (as amended by T.D. 8329, 56 Fed. Reg. 485 (Jan. 7, 1991), T.D. 8514, 58 Fed. Reg. 68299 (Dec. 27, 1993), and T.D. 9174, 70 Fed. Reg. 704 (Jan. 5, 2005)).

#### 1. Employee

In applying each of the tests the Court must first determine who are employees of Sound Diagnostic. For purposes of the function test under section

---

[25]Rev. Proc. 2008-72, sec. 5.02, 2008-50 I.R.B. 1286, 1288, was superseded by Rev. Proc. 2009-54, sec. 5.02, 2009-51 I.R.B. 930, 931 for 2010. Rev. Proc. 2009-54, sec. 5.02. contains the same phrase quoted above from Rev. Proc. 2008-72.

448, the term "employee" is not defined. In the case of employees who are also owners of a corporation, however, for purposes of employment taxes corporate officers are defined as statutory employees. Sec. 31.3121(d)-1(b), Employment Tax Regs.; see Alexander v. Commissioner, T.C. Memo. 2013-203, at *64-*65. Both Mr. and Mrs. Zia-Ahmadi were compensated as corporate officers. Accordingly, they were both employees for purposes of the function test.

For purposes of the ownership test, the regulations under section 448 provide a definition of employee:

> (ii) Definition of employee-- For purposes of the ownership test of * * * [section 1.448-1T(e)(5)], a person shall not be considered an employee of a corporation unless the services performed by that person for such corporation, based on the facts and circumstances, are more than de minimis * * *.

Sec. 1.448-1T(e)(5)(ii), Temporary Income Tax Regs., supra.

Although Sound Diagnostic hired consultants and contract labor, petitioners performed all employee services of Sound Diagnostic; thus their services were more than de minimis. Sound Diagnostic paid them each $30,500 in wages for each of the years in issue. Mr. Zia-Ahmadi was the principal person responsible for transporting and operating the ultrasound equipment as well as managing and maintaining the contracts with medical providers. Mrs. Zia-Ahmadi performed bookkeeping and administrative services. The record includes a substantial

number of checks from Sound Diagnostic's account that bear her signature, and the Court concludes that Mrs. Zia-Ahmadi's services were regular and not de minimis. Accordingly, for purposes of the ownership test the Court finds that petitioners meet the definition of employees of Sound Diagnostic. Therefore petitioners were Sound Diagnostic employees for both the function and ownership tests for the years in issue.

### 2. Function Test

The requirements of the function test are met if substantially all of the corporation's activities involved the performance of services in one of the following qualifying fields: health, law, engineering, architecture, accounting, actuarial science, performing arts, or consulting. Sec. 448(d)(2)(A); sec. 1.448-1T(e)(4)(i), Temporary Income Tax Regs., supra. "[S]ubstantially all of the activities" are measured by time spent by employees providing services. Sec. 1.448-1T(e)(4)(i), Temporary Income Tax Regs., supra.

Section 1.4487-1T(e)(4)(ii), Temporary Income Tax Regs., defines the provision of activities in the field of health as follows:

> [T]he performance of services in the field of health means the provision of medical services by physicians, nurses, dentists, and other similar health-care professionals. The performance of services in the field of health does not include the provision of services not directly related to a medical field, even though the services may

purportedly relate to the health of the service recipient.  For example, the performance of services in the field of health does not include the operation of health clubs or health spas that provide physical exercise or conditioning to their customers.

Sound Diagnostic asserts that its employees do not perform services in the field of health because employees who operate the ultrasound equipment (sonographers) are not required to be licensed in Colorado, do not provide direct treatment services to patients, and do not make healthcare decisions.  Healthcare professionals, however, are not limited to physicians or to licensed medical service providers.

The Court has held that the scope of the qualifying fields under section 448(d)(2) does not turn on State licensing laws.  Kraatz & Craig Surveying, Inc. v. Commissioner, 134 T.C. 167, 181 (2010).  Rather, whether a service is performed in one of the qualifying fields "is to be decided by all relevant indicia, including the text of the statute, its legislative history and regulations, application of the normal meaning of the term 'health' * * * and examination of services historically regarded as within the qualifying field."  Id.

Sound Diagnostic proposes a narrow interpretation of the term "health".  The Court has previously rejected taxpayers' overly restrictive arguments in defining the various services listed in the section 448 temporary income tax

regulations. Rainbow Tax Serv., Inc. v. Commissioner, 128 T.C. 42 (2007) (holding that the taxpayer's definition of accounting services was overly restrictive). The temporary income tax regulations do not so narrowly construe the requirements of the function test under section 448(d)(2). Rather, the phrase "field of health" includes services provided by healthcare professionals that are directly related to a medical field. See sec. 1.448-1T(e)(4)(ii), Temporary Income Tax Regs., supra. Thus, the Court rejects Sound Diagnostic's narrow reading and finds that the services performed by Sound Diagnostic's employees were in the field of health.

Sound Diagnostic also argues that none of its employees were healthcare professionals because they were not subject to minimum requirements to provide ultrasound services. Mr. Zia-Ahmadi's testimony, however, contradicts Sound Diagnostic's contention. Mr. Zia-Ahmadi testified that he attended and completed a two-year ultrasound associate program and worked for a hospital for a few years performing ultrasound services before forming Sound Diagnostic. He was the only employee of Sound Diagnostic to perform the ultrasound activities for the years in issue. He also testified that, while Colorado does not have a formal educational requirement for sonographers, employers and radiologists prefer a trained sonographer who has completed a two-year ultrasound associate program.

Sound Diagnostic's professional service agreements also support the finding that Mr. Zia-Ahmadi was a healthcare professional in the years in issue. The professional service agreements expressly state that Sound Diagnostic "contracts and employs licensed medical professionals." They also state that Sound Diagnostic would obtain and maintain accreditation with, among other organizations, the American College of Radiology, a professional medical society. The Court concludes that Sound Diagnostic performed services in the qualifying field of health. See sec. 1.448-1T(e)(3) and (4), Temporary Income Tax Regs., supra.

Moreover, Black's Law Dictionary defines a professional as "[a] person who belongs to a learned profession or whose occupation requires a high level of training and proficiency." Black's Law Dictionary 1329 (9th ed. 2009). Section 1.448-1T(e)(4)(ii), Temporary Income Tax Regs., supra, distinguishes between healthcare professionals who perform services directly related to a medical field-- which include but are not limited to physicians, nurses, dentists--and persons who are not healthcare professionals who perform services that provide physical exercise or conditioning, such as employees who work at health clubs or health spas. Sonographers are more similar to physicians and nurses than to health club

or health spa employees.  Therefore, Mr. Zia-Ahmadi, in performing the ultrasound activities as a sonographer, was a healthcare professional.

Sound Diagnostic also argues that it was not a qualified personal service corporation because less than 20% of its revenue was generated by personal services.  The fatal flaw with Sound Diagnostic's approach is that it relies upon revenue rather than time spent by its employees.  Under the function test "substantially all of the activities" of a corporation are measured by the time employees spent on activities, not the amount of revenue the employees generated.  Substantially all of the activities are in the qualifying field if the employees of the corporation spend 95% or more of their time in one of the qualifying fields.  Sec. 1.448-1T(e)(4), Temporary Income Tax Regs., supra.

Sound Diagnostic's only employees were petitioners.  The performance of any activity incident to the actual performance of qualifying field services, including administrative services, is considered the performance of services in that field.  Id.  Administrative services include secretarial, purchasing, and payroll services.  Sec. 1.448-1T(e)(5)(vii), Example (1).(i), Temporary Income Tax Regs., supra.  The bookkeeping, recordkeeping, and banking services Mrs. Zia-Ahmadi performed are administrative services and considered for purposes of the function test.  Petitioners were both employees of Sound Diagnostic, and 95% or more of

their time as such employees was spent on activities in the field of health.

Therefore, Sound Diagnostic meets the function test.

### 3. Ownership Test

The ownership test requires that for the taxable year 95% of the

corporation's stock, by value, be held, directly or indirectly, by employees

performing services in connection with activities in a qualifying field. Sec. 1.448-

1T(e)(5)(i)(A), Temporary Income Tax Regs., supra. In 2009 and 2010

petitioners, the only employees of Sound Diagnostic, owned 100% of Sound

Diagnostic's stock. The Court concludes that petitioners performed services for

Sound Diagnostic in connection with activities in a qualifying field described

under the function test. Therefore, Sound Diagnostic meets the ownership test of

section 448(d)(2)(A). Therefore, for the reasons stated above Sound Diagnostic is

a qualified personal service corporation and is taxed at a flat 35% rate.

## IV. Petitioners and AZR

Petitioners equally owned AZR. AZR owned ultrasound equipment that it

leased to Sound Diagnostic. Additionally, Sound Diagnostic and AZR paid many

of petitioners' personal expenses. For Federal income tax purposes, petitioners

caused AZR to elect to be taxed as a general partnership, and it filed partnership

returns for 2009 and 2010. Consequently, petitioners are taxed on their

distributive shares of AZR's gross receipts and are entitled to deduct their distributive shares of AZR's expenses as partners of AZR. Further, petitioners have bases in their partnership interests in AZR.

A. Constructive Dividends From Sound Diagnostic

Sound Diagnostic also paid petitioners' personal expenses totaling $17,962 and $52,782 for 2009 and 2010, respectively, from its corporate bank account, but for the same time period it did not make the full monthly contracted equipment lease payments to AZR. Respondent contends that Sound Diagnostic's payments of petitioners' personal expenses should constitute dividends rather than substitute equipment lease payments owed to AZR. Mr. Zia-Ahmadi asserts that the payment of petitioners' personal expenses was essentially the same as if Sound Diagnostic had made the full equipment lease payments to AZR, with AZR distributing the payments to petitioners, and petitioners paying their personal expenses.

Sound Diagnostic is a C corporation and not Mr. Zia-Ahmadi's sole proprietorship. Treating the payments for personal expenses as a distribution with an allocation of the distribution as equipment lease payments to AZR is a step too far. Additionally, although Sound Diagnostic's 2010 return reflected a loan of $24,193 to shareholders at the end of 2010, neither it or petitioners produced

promissory notes to support the existence of such a loan. Therefore, the Court concludes that the amounts paid for petitioners' personal expenses are constructive dividends from Sound Diagnostic to petitioners for 2009 and 2010.

B.      AZR's Gross Receipts

AZR reported income from the lease of the ultrasound equipment to Sound Diagnostic of $89,915 and $139,000 for 2009 and 2010, respectively, but Sound Diagnostic claimed a deduction for equipment lease payments to AZR of $101,165 and $139,000 for the same years. Respondent contends that AZR must report an amount of income the same as the amount of equipment lease payment deductions claimed by Sound Diagnostic. The Court has previously found that Sound Diagnostic's deductions were limited to the amount it actually paid AZR and that AZR's gross receipts should be reduced to reflect those amounts. The Court finds that AZR's rental income for 2009 and 2010 is equal to the equipment lease payments made by Sound Diagnostic totaling $89,915 and $108,500 for 2009 and 2010, respectively.

C.      AZR's Depreciation and Interest Expense Deductions

Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business. The taxpayer must own the property or make and maintain a capital investment in the

property to be entitled to a depreciation deduction with respect to such property. Larimore v. Commissioner, T.C. Memo. 1986-326, 1986 Tax Ct. Memo LEXIS 285, at *26-*27; see Miller v. Commissioner, 68 T.C. 767, 775 (1977).

On its 2010 Form 1065 AZR claimed a deduction for automobile depreciation of $22,120 with respect to the R8 and the Q7. AZR neither owned nor leased either of these automobiles, nor was either automobile used for AZR's business purpose. The Court concludes that AZR was not entitled to the claimed automobile depreciation deduction for the R8 and the Q7 for 2010.

Respondent also disallowed interest expense deductions of $3,295 and $5,808 for 2009 and 2010, respectively, for interest that related to the acquisition of petitioners' personal automobiles. The payments to finance those automobiles were not a business expense of AZR. Rather, the payments were personal expenses of petitioners and are not deductible by AZR for 2009 and 2010. Therefore, respondent's disallowance of these interest expense deductions is sustained.

D.    AZR's Lease Expenses for 2009 and 2010

In addition to the deductions claimed for depreciation relating to the ultrasound equipment, AZR also claimed deductions for the lease payments under the finance leases for the ultrasound equipment for 2009 and 2010. These leases

were agreements by Mr. Zia-Ahmadi as lessee to purchase the ultrasound equipment over time after making a series of lease payments during a set period and thereafter being entitled to acquire the property at a nominal cost at the end of the lease. Mr. Zia-Ahmadi then contributed the equipment and the leases to AZR. The ultrasound equipment leases were capital leases. The payments under a capital lease represent the purchase of equipment and are not a current expense. See Holden v. Commissioner, T.C. Memo. 2015-83, at *27. Petitioners cannot deduct lease payments in addition to deducting depreciation for the ultrasound equipment. Therefore, the Court finds that AZR's claimed deductions for lease payments are not allowed for 2009 and 2010.

E.     Self-Employment Tax on AZR's Passthrough Income

Section 1401 imposes a tax upon a taxpayer's self-employment income. Self-employment income includes the "net earnings from self-employment" derived by an individual during the taxable year. Sec. 1402(b). "Net earnings from self-employment" include a taxpayer's distributive share (whether distributed or not) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member. Sec. 1402(a).

AZR incorrectly reported its income and expenses from the lease of the ultrasound equipment on Form 8825. AZR's only earned income was from Sound

Diagnostic's lease payments for the ultrasound equipment. The income from the equipment leases was income from AZR's trade or business, and petitioners cannot rely on incorrectly reporting the lease income on Form 8825 to avoid self-employment tax. Therefore, petitioners are liable for self-employment tax on the passthrough income from AZR they reported on their 2009 and 2010 returns.

F.    AZR Distributions in Excess of Petitioners' Bases in 2010

Respondent contends that AZR's payments of petitioners' personal expenses must be examined under the partnership taxation rules, and if they exceed petitioners' bases in their partnership interests, the payments should be taxed to them as capital gain under section 731(a). Respondent determined that AZR made distributions of $4,666 that exceeded petitioners' bases in AZR for 2010. Respondent calculated the distributions in excess of the bases by using AZR's bank statements and balance sheets for 2009 and 2010,[26] which were entered into evidence as joint exhibits. Petitioners did not dispute the figures used or respondent's method of calculating the excess bases for 2010. Petitioners' only argument is that respondent failed to take into consideration promissory notes between AZR and Sound Diagnostic concerning unpaid lease payments.

---

[26]The distributions in 2009 did not exceed petitioners' bases in AZR.

Mr. Zia-Ahmadi testified that he was not sure whether such promissory notes existed, and petitioners did no more than state in their posttrial brief that such notes did exist. Petitioners did not request that the record be reopened to have the notes admitted into evidence. Petitioners have failed to produce any evidence to rebut respondent's calculations of their excess bases in AZR for 2010. Therefore, respondent's determination that petitioners received distributions in excess of their bases in AZR and that those distributions shall be taxed as long-term capital gain is sustained.

### G. Miscellaneous Deduction for Mileage

Petitioners assert that they are entitled to unreimbursed employee business expense deductions for mileage that Mr. Zia-Ahmadi drove as an employee of Sound Diagnostic. Mr. Zia-Ahmadi drove his personal automobiles as an employee of Sound Diagnostic and was not reimbursed for their use.

The strict substantiation rules under section 274(d) apply to the use of "listed property", as defined in section 280F(d)(4), which includes passenger automobiles. To deduct vehicle expenses for automobiles the taxpayer must substantiate by adequate records or sufficient evidence to corroborate the taxpayer's own testimony: (1) the amount of the expenditure or use (i.e. mileage); (2) the time and place of the travel, entertainment, or use; and (3) its business

purpose. Sec. 274(d) (flush language); sec. 1.274-5T(b)(6)(i)-(iv), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

The RS4 was used for Sound Diagnostic's business purpose (i.e., to transport the ultrasound equipment to the medical clinics). Mr. Zia-Ahmadi did not maintain contemporaneous mileage logs. He attempted to reconstruct them for purposes of trial, but the Court concluded that the reconstruction was not reliable. Respondent conceded on brief that Mr. Zia-Ahmadi had driven 18,180 miles for business in both 2009 and 2010. Mr. Zia-Ahmadi, however, did not provide adequate records or evidence to substantiate any mileage in excess of the amounts respondent conceded for 2009 and 2010. The Court finds that petitioners are entitled to a miscellaneous unreimbursed employee business expense deduction for 18,180 miles driven for each year in issue, and those expenses are subject to the computation limitations in effect for 2009 and 2010.[27]

## V.    Accuracy-Related Penalties for 2009 and 2010

Respondent determined accuracy-related penalties for Sound Diagnostic and petitioners for 2009 and 2010. Section 6662(a) and (b)(1) and (2) provides an

---

[27]The Court has found that Mr. Zia-Ahmadi drove the RS4 for business purposes. Mr. Zia-Ahmadi testified that he also drove a Volkswagen Jetta for business purposes. The Court need not make a determination that Mr. Zia-Ahmadi also drove the Jetta for business purposes because, even assuming he did, he has failed to substantiate any mileage in excess of what respondent has conceded.

accuracy-related penalty equal to 20% of the underpayment attributable to any substantial understatement of income tax or to negligence or disregard of rules or regulations.

While section 7491(c) places a burden of production on the Commissioner with respect to an individual taxpayer's liability for an accuracy-related penalty under section 6662, section 7491(c) does not apply where the taxpayer is a corporation. Therefore, Sound Diagnostic bears the burden of proving that it is not liable for accuracy-related penalties reflected in the notice of deficiency under section 6662(a). See NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006). The Court concludes that Sound Diagnostic has not met its burden of production. Although respondent bears the burden of production with respect to the 2009 and 2010 accuracy-related penalties determined for petitioners, respondent "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions * * * [because] the taxpayer bears the burden of proof with regard to those issues." Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

Respondent increased the accuracy-related penalties under section 6662(a) in his first amended answer, and respondent bears the burden of proving the liability for the increased amounts. The Court concludes that respondent has met his burden.

For corporations there is a "substantial understatement" of income tax for any year if the amount of the understatement for the taxable year exceeds the lesser of 10% of the tax required to be shown on the tax return or, if greater, $10,000, or $10,000,000. Sec. 6662(d)(1)(B). For individuals there is a "substantial understatement" of income tax for any year if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the tax return or $5,000. Sec. 6662(d)(1)(A); Higbee v. Commissioner, 116 T.C. at 448. "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code or to exercise ordinary and reasonable care in the preparation of a tax return. Sec. 6662(c); Higbee v. Commissioner, 116 T.C. at 448; sec. 1.6662-3(b)(1), Income Tax Regs. Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that would seem to a reasonable person to be exceptionally beneficial under the circumstances. See sec. 1.6662-3(b)(1), Income Tax Regs.

Pursuant to section 6664(c)(1), no penalty shall be imposed under section 6662 with regard to any portion of an underpayment if it can be shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Whether a taxpayer acted with reasonable cause and

in good faith is decided on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess his proper tax liability. Id.; see also Remy v. Commissioner, T.C. Memo. 1997-72.

Reasonable cause requires a taxpayer to have exercised ordinary business care and prudence as to the disputed item. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000) (citing United States v. Boyle, 469 U.S. 241 (1985), Hatfried, Inc. v. Commissioner, 162 F.2d 628, 635 (3d Cir. 1947), Girard Inv. Co. v. Commissioner, 122 F.2d 843, 848 (3d Cir. 1941), and Estate of Young v. Commissioner, 110 T.C. 297, 317 (1998)), aff'd, 299 F.3d 221 (3d Cir. 2002). Good-faith reliance on the advice of an independent, competent professional about the tax treatment of an item may meet this requirement. Id. To reasonably rely on a professional's advice, a taxpayer must prove by a preponderance of the evidence that: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Id. at 99.

A.      Sound Diagnostic

The Court finds that in the event the computations under Rule 155 establish that there is an understatement of income tax that exceeds the lesser of 10% of the tax required to be shown on each of Sound Diagnostic's returns or, if greater, $10,000, or $10,000,000, see sec. 6662(d)(1)(B), (2)(A), then Sound Diagnostic has substantially understated its income tax and is liable for penalties under section 6662(a) and (b)(2) for 2009 and 2010.

Whether or not the computations under Rule 155 establish a substantial understatement of income tax for either year, Sound Diagnostic is liable for accuracy-related penalties because it was negligent in the preparation of its tax returns for 2009 and 2010.

 Sound Diagnostic has not provided any evidence, including credible testimony, that it made a reasonable attempt to ascertain the correctness of the expenses it reported with respect to the equipment lease payments and the vehicle expenses with respect to petitioners' personal automobiles.  Sound Diagnostic was negligent with respect to the overstated equipment lease payment deductions and the claimed vehicle expense deductions for 2009 and 2010.

Although a tax preparer prepared Sound Diagnostic's tax returns, the evidence does not show that it relied on that tax preparer's advice for its reporting

on any of the issues in dispute. Sound Diagnostic has not proven that it had an honest misunderstanding of the law that is reasonable in light of all the facts and circumstances. Sound Diagnostic has not proven that the underpayments for 2009 and 2010 were due to reasonable cause and good faith within the meaning of section 6664(c), and so it is liable for an accuracy-related penalty for each year in issue.

## B. Petitioners

The Court finds that in the event the computations under Rule 155 establish that there is an understatement of income tax that exceeds the greater of 10% of the tax required to be shown on petitioners' returns or $5,000, see sec. 6662(d)(1)(A), then petitioners have substantially understated their income tax and are liable for penalties under section 6662(a) and (b)(2) for 2009 and 2010. Whether or not the computations under Rule 155 establish a substantial understatement of income tax, petitioners are liable for the accuracy-related penalties because they were negligent in the preparation of their tax returns for 2009 and 2010.

Petitioners focus on the efforts they made once their tax returns were under examination to establish that they were not negligent. The period when a taxpayer's conduct is examined for negligence, however, is when the tax return

was filed. Petitioners have not provided any evidence, including credible testimony, that they made a reasonable attempt to ascertain the correctness of the expenses they reported with respect to AZR's gross receipts, the correctness of excluding self-employment tax on AZR's passthrough income by classifying the ultrasound lease income as rental real estate income, or the tax consequences of the payment of their personal expenses by both Sound Diagnostic and AZR. A reasonable person would have questioned whether the payments by a separate entity of personal expenses were deductions for the entity. A reasonable person would have also questioned whether a separate entity could deduct expenses for automobiles that he or she owned and used for personal reasons.

The Court concludes petitioners were negligent with respect to the miscalculated gross receipts of AZR, the failure to pay self-employment tax on their AZR income, and the failure to treat the payment of some of their personal expenses as income for 2009 and 2010.

The same tax preparer who prepared Sound Diagnostic's returns prepared petitioners' tax returns for the years in issue. Petitioners did not prove, however, that they relied on that tax preparer's advice with respect to any of the items in dispute. They have not proven that they had an honest misunderstanding of the law that is reasonable in light of all the facts and circumstances. Petitioners have

not proven that the underpayments for 2009 and 2010 were due to reasonable cause and good faith within the meaning of section 6664(c), and so they are liable for an accuracy-related penalty for each year in issue.

The Court has considered all of the arguments made by the parties, and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

To reflect the foregoing,

Decisions will be entered under Rule 155.